# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

ALEXANDER FAULKNER,

                    Defendant.

CASE NO. 14-CR-05 (JNE/TNL)

**REPORT & RECOMMENDATION**

---

Benjamin Bejar and Andrew Dunne, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff; and

Paul Schneck, of **Paul Schneck, LTD**, 222 South Ninth Street, Suite 1600, Minneapolis, MN 55402, and Lousene M. Hoppe, **Fredrikson & Byron, PA**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, for Defendant.

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Alexander Faulkner's Motion to Dismiss the Indictment (ECF No. 43) and Faulkner's Motion and Amended Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF Nos. 23, 42). The Court heard oral argument on Faulkner's motions on April 9, 2014, and April 14, 2014. (ECF Nos. 56, 57.) After the hearings, the parties provided written submissions to the Court. (ECF Nos. 69, 72, 76.) Benjamin Behar and Andrew Dunne represented the United States. Paul Schneck and Lousene M. Hoppe represented Faulkner.

## I.     FINDINGS OF FACT

### A.  Confidential Reliable Informant Tip and Investigation

In September of 2013, Officer Joshua Domek and Officer Christopher Humphrey of the Minneapolis Police Department received a tip from a confidential reliable informant ("CRI") that Faulkner was traveling by car to Chicago, Illinois, to obtain heroin for distribution in Minnesota. (T. 15.) Officer Domek testified that they had worked with the CRI and the CRI had provided them with reliable information in the past. (T. 15.) The CRI told the officers that Faulkner lived or was associated with residences at 11** James Avenue in Minneapolis ("James Address") and 11** Hamline Avenue in St. Paul ("Hamline Address"), and that he drove both an orange Chevrolet Avalanche truck and a silver Chrysler 300. (T. 15-17.) The CRI told the officers that he had observed Faulkner in possession of heroin inside both cars and at both addresses. (T. 17.)

The officers obtained a photograph of Faulkner from Minnesota Driver and Vehicle Services ("DVS"), and the CRI identified the man in the photograph as the man he was talking about. (T. 16.) The officers were able to verify that Faulkner had an orange Chevrolet Avalanche registered under his name. (T. 17-18.) The DVS vehicle registration listed Faulkner's address as the Hamline Address, and Faulkner's name was listed on the registry for the apartment building at the Hamline Address. (T. 18, 20; Gov't Ex. 8.) The officers also determined that Faulkner's driver's license listed his address as the James Address. (T. 19-20.) The officers observed both an orange Chevrolet Avalanche and silver Chrysler 300 at both the Hamline Address and the James Address.

(T. 21.) The officers also observed Faulkner inside the orange Chevrolet Avalanche outside the Hamline Address. (T. 21.)

### B.  GPS Affidavit and Warrant

Based on the information obtained from the CRI, Officer Humphrey presented an affidavit for a warrant to place a GPS tracking device on Faulkner's cars. (Gov't Ex. 1.) The affidavit states that: Officer Humphrey received information from a "confidential reliable informant;" Faulkner "is involved in the sale of illegal narcotics throughout Minneapolis;" the CRI identified Faulkner by his DVS picture; the CI informed Officer Humphrey that Faulkner drives to Chicago in either his silver Chrysler 300 or his orange Chevrolet Avalanche to pick up heroin and transports it back to Minneapolis; DVS lists confirm that two vehicles matching the CRI's descriptions are registered to Faulkner; through surveillance, police found a residence for Faulkner in St. Paul; and his cars were seen in various places in North Minneapolis. (*Id.* at 2.)

Based on the representations in his affidavit, Officer Humphrey obtained a warrant to install a GPS tracking device on each of Faulkner's cars from a District Court Judge of Minnesota's Fourth Judicial District located in Hennepin County. (*Id.* at 4.) The warrant identified Faulkner's cars by year, make, model, color, license plate, and VIN number. (*Id.* at 1.) The warrant issued on September 27, 2013, and authorized the installation of a GPS tracking device on Faulkner's cars within ten days "wherever [they] may be found within the County of **HENNEPIN**." (*Id.* at 4) (emphasis in original). The warrant also provided that the GPS tracking device could be removed and reinstalled as necessary "wherever it may be found." (*Id.*)

Officer Domek testified that the warrant and affidavit were generated on an outdated template. (T. 26.) According to Officer Domek's testimony, the template that the Minneapolis Police Department usually uses has "extra verbiage" that would allow the GPS tracking device to be placed anywhere the target vehicle can be found in the state of Minnesota. (T. 26.)

Law enforcement was unable to locate the orange Chevrolet Avalanche for several days. Finally, at 9:38 p.m. on October 4, 2013, two days before the deadline for attaching the tracking device expired, officers located Faulkner's Avalanche at the Hamline Address in St. Paul, Minnesota. (T. 25-26, 189-90, 210-13.) Officer Humphrey testified that law enforcement placed the GPS tracking device on Faulkner's Chevrolet Avalanche while it was in Ramsey County. (T. 26, 211-12.)

After they attached and activated the GPS tracking device, officers could monitor the location data it transmitted at the Special Operations Center ("SOC"). (T. 27-29.) On October 16, 2013, the GPS data placed the Avalanche in the Chicagoland area at approximately 3:15 p.m. (T. 30-31.) According to the GPS data, the Avalanche stayed in the Chicagoland area for approximately six hours and returned to the Hamline Address in Minnesota at approximately 11:45 p.m. (T. 31-32, 127.) The next morning, GPS data showed that the Avalanche left the Hamline Address at approximately 11:00 a.m., made several stops around St. Paul and Minneapolis, and arrived at the James Address at approximately 12:15 p.m. (T. 36-37; Gov't Exs. 12, 13.)

### C. James Address, Hamline Address, and Chevrolet Avalanche Warrants

On October 21, 2013, GPS data again showed the Avalanche cross the border from Minnesota into Wisconsin. (T. 38.) According to the GPS data, the Avalanche stayed in Chicago for approximately 15 hours before departing Chicago around10:30 p.m. (T. 39, 127.)

While the Avalanche was traveling back to Minnesota, Officer Humphrey applied for and obtained warrants to search the Hamline Address, the James Address, and the Avalanche. Officer Domek arranged for the Avalanche to be stopped once it re-entered Minnesota from Wisconsin. At approximately 6:15 a.m. on October 22, law enforcement located the Avalanche traveling on Interstate 94-West and stopped it after reentering Minnesota; Faulkner was riding in the back seat with his dog, Faulkner's adult son was driving, and Faulkner's son's wife was in the passenger seat. (T. 43-50.) Faulkner was detained from the time of the stop, and formally arrested at approximately 8:15 a.m. (T. 60-61.) Investigators found a small baggie of marijuana during a preliminary search of the Avalanche and then drove it to the SOC to preserve the vehicle before executing the search warrant. (T. 50, 58.)

At 7:40 a.m., law enforcement executed the search warrant on the James Address. At 7:42 a.m., law enforcement executed the search warrant on the Hamline Address. Officer Humphrey first assisted with the search of the James Address, and then assisted with the search of the Hamline Address. The search warrant for the Avalanche was executed on October 24, 2013 at the SOC. (Gov't Ex. 5.)

Law enforcement obtained two more search warrants. On October 23, 2013, law enforcement obtained a warrant authorizing the seizure of a DNA sample of Faulkner via buccal swab. (Gov't Ex. 5.) This warrant was executed on October 23, 2013, at 1:52 p.m. (Gov't Ex. 5.) The second warrant authorized law enforcement to return to the Hamline Address (1) to retrieve a known DNA sample of Faulkner from the bedding, (2) to test keys found on Faulkner's person when he was arrested, and (3) to search the garage associated with the Hamline Address. (Gov't Ex. 6.) This warrant was executed on October 28, 2013, at 1:45 p.m. (Gov't Ex. 6.)

### D.  Faulkner's Second Arrest

Faulkner was eventually released from custody. On January 7, 2014, the indictment in the instant matter issued. (ECF No. 1.) An arrest warrant for Faulkner issued shortly thereafter, and on January 14, 2014, law enforcement learned that Faulkner was staying at 28** Irving Avenue in Minneapolis ("Irving Address"). (T. 65.)

At approximately 8:30 a.m., Officer Domek and several other officers knocked on the door at the Irving Address. (T. 65.) Shortly after knocking, Officer Domek observed a male come to the front and look out the front window. (T. 65.) Officer Domek immediately recognized the male as Faulkner and motioned that he come to the door. (T. 66.) Faulkner opened the door and Officer Domek placed him under arrest. (T. 66.)

When Faulkner answered the door, he appeared to have been sleeping and only recently to have woken up. (T. 66-67.) After he was arrested, Faulkner requested that he be allowed to get some clothes. (T. 67.) He directed officers to his room in the northwest corner of the main level of the Irving Address and stated that he had a black puffy coat in

his room. (T. 67-68.) Faulkner made a statement about his black puffy coat and then led Officer Domek to the clothing he wanted. (T. 68.) Faulkner checked each item of clothing for weapons or contraband. (T. 68.) Officer Domek then uncuffed one of Faulkner's hands, Faulkner put his clothes on, and Officer Domek recuffed him. (T. 68.) While in Faulkner's room, Officer Domek observed several loose rounds of ammunition around the room. (T. 68.) Officers accompanying Officer Domek then informed him that they had found a quantity of heroin in Faulkner's black puffy coat. (T. 68.) At that point, Officer Domek froze the scene in order to obtain a search warrant for the Irving Address. (T. 69; Gov't Ex. 7.) Law enforcement executed the search warrant on January 14 at 10:30 a.m. (Gov't Ex. 7.)

### E. Motions Before the Court

Faulkner now moves the Court to dismiss the indictment and to suppress evidence seized from the Avalanche, the James Address, the Hamline Address, and the Irving Address, arguing: (1) the search warrants lacked probable cause; (2) installation of the GPS tracking device on the Avalanche violated Faulkner's Fourth Amendment rights; and (3) the search warrant for the Hamline Address was improperly executed.

## II.   MOTION TO DISMISS

Faulkner has moved to dismiss the indictment, arguing that the indictment "fails to plead at least three violent felonies or serious drug offenses that were committed on

occasions different from one another for which [ ] Faulkner was convicted prior to the incidents charge [sic] in the [i]ndictment."[1] (ECF No. 43.)

When considering a pretrial motion to dismiss an indictment, the allegations contained in the indictment should be accepted as true. *See United States v. Najarian*, 915 F. Supp. 1460, 1463 n.3 (D. Minn. 1996) (citing *inter alia, United States v. Sampson*, 371 U.S. 75, 78-79 (1962)). "[F]ederal criminal procedure does not 'provide for a pre-trial determination of sufficiency of the evidence.'" *United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (quoting *United States v. Critzer*, 951 F.2d 306, 307-08 (11th Cir. 1992)). "Indictments are normally sufficient unless no reasonable construction can be said to charge the offense." *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995) (citation omitted).

Faulkner's claim that the indictment fails to plead at least three violent felonies or serious drug offenses committed on occasions different from one another is meritless. The first page of the indictment includes a chart that sets forth exactly that information. On its face, the indictment contains a "plain, concise, and definite written statement of the essential facts [and elements] constituting" the offenses charged. Fed. R. Crim. P. 7(c)(1). Accepting all the allegations in the indictment as true, the Government has sufficiently pleaded Counts 1-3. Accordingly, Defendant's motion to dismiss must be denied.

---

[1] To the extent Faulkner's Motion to Dismiss argues that the indictment should be dismissed because Faulkner's arrest and the searches of his residences and vehicles were not supported by probable cause, the Court considers the Motion to Dismiss in conjunction with Faulkner's Motion to Suppress below.

### III.   MOTIONS TO SUPPRESS

Faulkner challenges the probable cause supporting (1) the GPS tracker warrant, (2) the warrant to search the James Address, (3) the warrant to search the Hamline Address, (4) the warrant to search the Chevrolet Avalanche, (5) the warrant for a buccal swab, (6) the second warrant to search the Hamline Address, and (7) the warrant to search the Irving Address. Faulkner also argues that because law enforcement installed the GPS tracking device in Ramsey rather than Hennepin County, they acted without a warrant and, therefore, all evidence from the GPS tracking device must be suppressed. Finally, Faulkner argues that the statements he made when he was arrested at the Irving Address should be suppressed because he was not read his *Miranda* rights.[2]

### A. Probable Cause

Probable cause determinations "d[o] not deal with hard certainties, but with probabilities." *Illinois v. Gates*, 462 U.S. 213, 231 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). "Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of

---

[2] Faulkner's motion for a *Franks* hearing is addressed in this Court's contemporaneously filed Order on Pretrial Motions.

supplying reliable information, or if it is corroborated by independent evidence." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993) (citing *Draper v. United States*, 358 U.S. 307, 313 (1959)).

### 1. GPS Tracker Affidavit and Warrant

With respect to the GPS tracking device warrant, Officer Humphrey's supporting affidavit contained the following information:

> In the last 72 hours, your affiant received information from a confidential reliable informant (CRI herein) that a male known to them as "Alexander Faulkner" is involved in the sale of illegal narcotics throughout Minneapolis. Your affiant provided the CRI with a picture obtained from the Minnesota [DVS] of Alexander Faulkner [ ]. The CRI identified the male in the picture as the male known to them as "Alexander Faulkner."
>
> The CRI informed your affiant that Faulkner travels to Chicago, Illinois in either a silver Chrysler 300 or a [sic] orange four door pick[-]up truck to pick up a quantity of heroin. Faulkner then transports the heroin back to Minneapolis for distribution.
>
> In checking the DVS website, your affiant learned MN XXX MDV and MN UWH XXX list to Faulkner. It should be noted that these vehicles match the description provided by the informant.
>
> Through surveillance, your affiant located a residence for Faulkner in St. Paul, Minnesota and also located both vehicles in the parking lot of the residence. In checking the Minneapolis Police Department[']s license plate reader (LPR herein), both of the vehicles were located at several areas throughout north Minneapolis.
>
> Your affiant believes that the aforementioned vehicles are being used by Faulkner to traffic narcotics into Minneapolis, MN from Chicago, IL for distribution. Your affiant requests for an order of the court to utilize a tracking device to monitor the movements of the aforementioned vehicles.

(Gov't Ex. 1.)

Faulkner argues that the affidavit fails to establish probable cause. The Court disagrees and finds that the affidavit did establish probable cause. Law enforcement confirmed that Faulkner was registered to two cars that matched the CRI's description. This is not corroboration of illegal activity, but corroboration of innocent activity in a CRI's tip can provide a sufficient basis for probable cause that the illegal activities in the tip are occurring. *E.g.*, *Draper*, 358 U.S. at 313 (finding probable cause where the only corroboration of a confidential informant's tip was of non-illegal details). In such cases, the CRI's tip gains credibility because where "'an informant is right about some things, he is more probably right about other facts.'" *Gates*, 462 U.S. at 244 (quoting *Spinelli v. United States*, 393 U.S. 410, 427 (1969)).

Here, the CRI was also able to identify Faulkner by his DVS photograph. Law enforcement independently corroborated that the Faulkner in the DVS photograph was registered to two vehicles that matched the make, model, and color of the cars the CRI told law enforcement Faulkner drove to get drugs from Chicago. Law enforcement also located the described vehicles in the parking lot of a residence listed to Faulkner's name in St. Paul. Accordingly, in light of the totality of the circumstances, the independently corroborated details of the CRI's tip, and the "considerable deference" that reviewing courts give to probable-cause determinations of issuing judges, *United States v. Bieri*, 21 F.3d 811, 815 (8th Cir. 1994), this Court determines that the affidavit contains sufficient facts to establish a reasonable belief that contraband or evidence of a crime would be found by tracking Faulkner's car.

Even assuming, *arguendo*, that the affidavit failed to establish probable cause, the Court determines that the officers executing the warrant "acted in objectively reasonable reliance on a warrant issued by a neutral magistrate." *United States v. Gibson*, 928 F.2d 250, 253 (8th Cir. 1991) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). "In the ordinary case, an officer cannot be expected to question the magistrate's probable cause determination or his judgment . . . ." *Leon*, 468 at 921. "[A]bsent allegations that the [issuing judge] was not neutral, 'suppression is appropriate only if the officers were dishonest or reckless in preparing the affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" *United States v. Formaro*, 152 F.3d 768, 771 n.4 (8th Cir. 1998) (citing *United States v. Fulgham*, 143 F.3d 399, 401-02 (8th Cir. 1988) (quoting *Leon*, 468 U.S. at 926)).

The exclusionary rule was judicially created to provide an effective deterrent against unlawful police conduct and its purposes are not served by suppressing evidence where police officers rely in reasonable good faith on a properly obtained warrant. *E.g.*, *United States v. Thomas*, 263 F.3d 805, 808 (8th Cir. 2001). Here, nothing in the record indicates that Officer Humphrey acted in reckless disregard for the truth when preparing the affidavit,[3] or that the issuing judge was anything other than neutral and detached when issuing the warrant. *United States v. Murphy*, 69 F.3d 237, 242 (8th Cir. 1995). Neither was the warrant "so facially lacking in probable cause as to preclude the executing officer's good faith reliance thereon." *United States v. McNeil*, 184 F.3d 770,

---

[3] The Court addresses this argument more comprehensively in its contemporaneously filed Order on Pretrial Motions when taking up Faulkner's request for a *Franks* hearing.

775 (8th Cir. 1999). In executing the warrant, police relied in good faith on the probable-cause determination of a neutral magistrate. Accordingly, Faulkner's motion to suppress the fruits of the GPS tracking device warrant must also be denied on good faith grounds.

## 2.  Execution of the GPS Tracking Device Warrant

Separate from his probable cause challenge, Faulkner argues that all evidence from the GPS warrant should be suppressed because (1) execution of the warrant outside the geographical limitations set forth in the warrant transformed the installation of the GPS tracking device into a warrantless search, and (2)  installation of the device outside of Hennepin County violated Minn. Stat. § 626A.35.

The main thrust of Faulkner's suppression argument is that the installation of the GPS tracking device beyond the geographical limits set forth in the warrant transformed the installation into a warrantless search under *United States v. Jones*, 132 S. Ct. 945 (2012). The Government argues that the warrant justifies installing the GPS tracking device even though the installation occurred in Ramsey County.

Faulkner's reliance on *Jones* is unavailing. In *Jones*, the Supreme Court held that the physical installation of a GPS tracking device on a defendant's vehicle and the subsequent use of that device to monitor the vehicle's movements is a Fourth Amendment search. 132 S. Ct. at 949. There, law enforcement was investigating Jones on suspicion of trafficking narcotics. *Id.* at 948. In the course of the investigation, law enforcement obtained a warrant authorizing the installation of a GPS tracking device on Jones's car in the District of Columbia within 10 days. *Id.* Despite those two conditions, law enforcement installed the tracking device on Jones's car on the 11th day and in the

state of Maryland. *Id.* The Supreme Court affirmed the D.C. Circuit's reversal of Jones's conviction, rejecting the Government's only argument—"that a warrant was not required" because attaching a GPS tracking device to the underside of an automobile was not a search under the Fourth Amendment. *Id.* at 948 n.1. In doing so, the Supreme Court did not analyze the validity of the underlying warrant because the Government had conceded that the device had been installed after the ten-day limit had expired and outside the federal jurisdiction of the issuing judge. Indeed, the Government's argument in *Jones* relied on the fact that no valid warrant existed to justify the placement of the GPS tracking device. As such, the Supreme Court's determination in *Jones* that the trespassory act of placing the GPS tracker on the car is a Fourth Amendment search does not control the issue before this Court.

Unlike *Jones*, the Government here argues that the installation at issue was authorized by the warrant. The court in *United States v. Hersman*, Crim. No. 2:13-cr-00002, 2013 WL 1966047 (S.D. W.Va. May 10, 2013), a case arising from nearly identical facts, addressed a very similar argument. In that case, law enforcement was investigating the defendant for suspected drug trafficking across state lines. Investigators acquired a warrant permitting the placement and monitoring of a GPS tracking device on the defendant's car. *Id.* at *2. The warrant identified the defendant's car as a Mitsubishi Eclipse and listed both the vehicle registration number and the VIN number. *Id.* at *7. The warrant authorized placement of the tracking device within the confines of Clay County. *Id.* The same day they acquired the warrant, law enforcement enlisted an informant to ask the defendant if he could borrow the defendant's car. *Id.* at *2. After

obtaining consent to drive the defendant's car, the informant drove the Eclipse to a place

where law enforcement could install the GPS tracking device without risking detection.

*Id.* at \*7. Law enforcement actually installed the device in Belva, West Virginia, outside

the jurisdictional limits of Clay County. *Id.* The defendant raised the same argument in

*Hersman* that Faulkner raises in the instant matter: because law enforcement installed the

GPS tracking device on his vehicle outside the geographical limitations set forth in the

warrant, the installation occurred without a warrant. *Id.* at \*7.

The *Hersman* Court found the defendant's argument unpersuasive:

> The fact that the GPS device was installed outside of Clay County
> does not render the warrant constitutionally defective. As the United
> States argues, the Fourth Amendment requires that search warrants
> particularly describe the place to be searched and the items to be
> seized. *Anderson v. Maryland*, 427 U.S. 462, 480 (1976). A warrant
> meets this particularity requirement "if the description is such that
> the officer with a search warrant can, with reasonable effort,
> ascertain and identify the place intended." *Steele v. United States*,
> 267 U.S. 498, 503 (1925). The warrant explicitly describes
> Defendant's car by make, model, registration number, and vehicle
> identification number. There can be no question that the officers
> would be able to find the right "place" to be searched. Under West
> Virginia law—which does not control the Court's analysis—search
> warrants may be issued by a magistrate or a judge of a circuit court
> "within the county wherein the property or person sought is located."
> W. Va. R. Crim. P. 41(a). There is no question that the Mitsubishi
> Eclipse was located in Clay County at the time the detectives applied
> for the warrant. There is also no question that Belva, West Virginia
> is within the Southern District of West Virginia. Indeed, had the
> GPS warrant been issued by a federal judge, the officers would have
> been authorized to execute the warrant anywhere within the
> Southern District of West Virginia, including Belva, West Virginia.
> Rule 41(b)(4) of the Federal Rules of Criminal Procedure provides:
> "[A] magistrate judge with authority in the district has authority to
> issue a warrant to install within the district a tracking device; the
> warrant may authorize use of the device to track the movement of a
> person or property located within the district, outside the district, or

both." Thus, assuming all other facts remain the same, where there would have been no constitutional violation had a federal warrant issued by a federal judge, no violation under the Fourth Amendment of the United States Constitution can be reasonably said to have occurred here based on the state-issued warrant.

*Id.* at *7.

The *Hersman* court's approach is consonant with the approach of courts in this district and in the Eighth Circuit. It is a firmly established principle that "federal courts do not suppress evidence seized by state officers in conformity with the Fourth Amendment because of state law violations." *United States v. Appelquist*, 145 F.3d 976, 978 (8th Cir. 1998) (quoted in *United States v. Kelley*, 652 F.3d 915, 917 (8th Cir. 2011)); *see also United States v. Ross*, 713 F.2d 389, 393 n.7 (8th Cir. 1983) ("We reject Ross's argument that since a state court magistrate issued the warrant, state law must be used to examine whether there was probable cause for its issuance. Whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by an unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers." (citation omitted)).

In *United States v. Hernandez*, the Honorable John R. Tunheim, United States District Judge for the District of Minnesota, upheld the constitutionality of a warrant that was issued by a state court judge in St. Louis County, Minnesota, to search for records being held in Sioux Falls, South Dakota. Crim. No. 08-198(1) (JRT/RLE), 2008 WL 4748576 (D. Minn. Oct. 28, 2008). The Court determined that even though the state court judge "exceeded his territorial jurisdiction by authorizing the seizure of financial records from an institution in South Dakota" in violation of Minn. Stat. § 626.13, such a violation

of statutory law requires suppression only where the violation is of a constitutional nature. *Id.* at *14 (quoting *State v. Lien*, 265 N.W.2d 833, 841 (Minn. 1978)) (citations omitted). The warrant at issue was supported by probable cause and established a nexus between the defendant and the place to be searched, and therefore, suppression was not required because the statutory violation was "non-fundamental." *Id.* at *16.

Courts in both the Eighth Circuit and the State of Minnesota are in accord that minor defects or technical violations in warrant execution do no trigger the exclusionary rule so long as the warrant in question meets the Fourth Amendment's requirements of (1) probable cause as determined by a neutral magistrate, and (2) particularly describing the place to be searched or the items or things to be seized.. *E.g.*, *United States v. Bach*, 310 F.3d 1063, 1066 (8th Cir. 2002), *cert. denied*, 538 U.S. 993 (2003) (determining that even though state officers executing a search served the warrant outside the issuing judge's jurisdiction, "such a violation would not warrant suppression of the evidence gained because federal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment" requirements of probable cause as found by a neutral magistrate and particular description of the place to be searched or the items to be seized); *United States v. Freeman*, 897 F.2d 346, 348 (8th Cir. 1990) (refusing to exclude evidence for "procedural violations which do not implicate the constitutional values of probable cause or description with particularity of the place to be searched and items to be seized"); *State v. Lunsford*, 507 N.W.2d 239, 243 (Minn. Ct. App. 1993), *rev. denied* (Minn., Dec. 14,

1993) (refusing to exclude evidence obtained by a warrant for statutory violations where "[n]o constitutional violation is alleged").

Applying this rule to the instant case, the warrant authorizing installation of the GPS tracking device was approved by a neutral magistrate in Hennepin County, Minnesota, who found probable cause to issue the warrant. The installation authorized by the warrant was executed within the specified timeframe. The warrant particularly described Faulkner's Avalanche by year, make, model, color, license plate, and VIN number. As in *Hersman*, "[t]here can be no question that the officers would be able to find the right place to be searched." 2013 WL 1966047 at *7 (internal quotation marks omitted). Had a federal judge issued the warrant, law enforcement would have been able to install the GPS tracking device anywhere within the District of Minnesota. And, there is no dispute that both Hennepin and Ramsey Counties are within the jurisdiction of the District of Minnesota. In placing the GPS tracking device on Faulkner's Avalanche, law enforcement was executing a search that had been evaluated and authorized by a neutral magistrate on a particularly described car.

Importantly, the Court determines that the officers executing the warrant did not intentionally or deliberately disregard the warrant or act in bad faith. *See Hernandez*, 2008 WL 4748576, at *16-17. The GPS tracking device was installed eight days after the warrant issued—just two days before the warrant was to expire. On cross-examination, defense counsel asked Officer Humphrey whether he attached the GPS tracking device in Ramsey County even though he knew that it was supposed to be attached in Hennepin County according to the plain language of the warrant. Officer Humphrey responded, "I

do see now that in error we did install it in Ramsey County when we should have installed it in Hennepin; however, we installed it at the first opportunity that we could." (T. 90-91.) Officer Humphrey also stated that he "never willfully attached the GPS tracker intentionally violating the order" and that "[i]t was not a choice that [law enforcement] made to intentionally violate the order, it was a choice that [they] made because [they] could not find the vehicle prior to installing it." (T. 91, 92.)[4] Both Officers Humphrey and Domek testified that the execution of the warrant in Ramsey County was a good-faith effort to execute the GPS tracking device warrant on a mobile target before the warrant expired, and the Court finds the officers' testimony to be credible. In light of the lack of bad faith and the warrant's satisfaction of the Fourth Amendment's probable-cause and particularity requirements, there is no basis on which to conclude that the evidence obtained from the GPS tracking device should be suppressed on Fourth Amendment grounds.

Faulkner's state-law argument is similarly unavailing. The Government admits that the GPS tracking device was placed on Faulkner's Avalanche in Ramsey County. Even though the execution of the GPS tracking device warrant was outside of the geographical limitations set forth in the warrant itself, "[a]n order of a district court is enforceable throughout the state." *State v. Loveless*, 425 N.W.2d 602, 604 (Minn. Ct. App. 1988), *rev. denied* (Minn. Aug. 31, 1988). Indeed, Minnesota courts view the

---

[4] Officer Domek's testimony at the motions hearing was in agreement with Officer Humphrey's, labeling the execution of the warrant in Ramsey County as a "mistake" and a good-faith effort to execute a time-sensitive warrant on a mobile target. (T. 26, 83-84.) Moreover, Officer Domek represented that the warrant template that they usually use allows placement of the GPS tracking device anywhere in the State of Minnesota. (T. 26.)

execution of a search warrant outside the issuing judge's venue as, "at most, a minor defect or technical violation." *State v. Morris*, No. C7-96-2553, 1997 WL 559739 (Minn. Ct. App., Sept. 9, 1997); *see also Hernandez*, 2008 WL 4748576 at *14. Accordingly, whether execution of the warrant violated Minnesota law has no effect on the potential admissibility of the seized evidence in federal court; the question is whether the evidence was obtained in conformity with the Fourth Amendment. As set forth above, this Court determines that it was.

In sum, the warrant authorizing the installation of the GPS tracking device on Faulkner's Avalanche was supported by probable cause, and this Court finds no basis on which to suppress the evidence obtained by the GPS tracking device. The warrant was approved by a neutral magistrate and particularly described the vehicle to which the device was to be attached. Accordingly, the Court determines that no violation under the Fourth Amendment of the Constitution occurred when law enforcement installed the GPS tracking device in Ramsey County.

### 3.  Hamline Address Affidavit and Warrant

The affidavit supporting the search warrant for the Hamline Address contained the following information: law enforcement received a tip from a CRI that a black male was trafficking heroin from Chicago to North Minneapolis; the CRI had worked with law enforcement before and his tips had proved true and correct on numerous occasions; the CRI had direct personal knowledge of the male and his illegal narcotics trafficking; the

CRI identified Faulkner by name and provided a picture of him[5]; the CI stated that Faulkner makes trips to Chicago every one to three weeks to pick up at least 100 grams of heroin; the CRI stated that one of the vehicles Faulkner would drive was his orange Chevrolet Avalanche; Faulkner's criminal history revealed that Faulkner was a convicted felon with a narcotics- and weapons-related criminal past; DVS records revealed that Faulkner owns an orange Chevrolet Avalanche; Faulkner provided the Hamline Address as his own address on his vehicle registration for the Avalanche; law enforcement had attached a GPS tracking device to Faulkner's Avalanche and personally viewed Faulkner driving the orange Avalanche; data from the GPS tracking device showed that the Avalanche traveled to Chicago on October 16, stayed in the city for approximately 4 hours, and drove back to the Hamline Address; data from the GPS tracking device showed the Avalanche in Chicago at the time of the warrant application; data from the GPS tracking device was consistent with night-time narcotics trafficking; and law enforcement believed that Faulkner would be returning to Minnesota with illegal narcotics. (Gov't Ex. 2.)

Faulkner attacks the warrant for the Hamline Address line-by-line, arguing that the supporting affidavit fails to establish sufficiently the CRI's reliability, law enforcement did not sufficiently corroborate the CRI's claims about drug trafficking, the information in the affidavit was stale, and there was no nexus between the alleged illegal activity and

---

[5] The affidavit provides that the CRI produced the photograph of Faulkner. Officer Humphrey's testimony, however, made clear that the CRI identified Faulkner by his DVS photograph that law enforcement provided for identification purposes. (T. 195.) The Court addresses this discrepancy when it analyzes Faulkner's request for a *Franks* hearing in the contemporaneously filed Order on Pretrial Motions. For purposes of probable-cause determination, however, this discrepancy is immaterial.

the address to be searched. Even though, "taken in isolation, certain paragraphs from the affidavit discuss events distant in time from the application of the warrant" and events that occurred in places other than the Hamline Address, "the magistrate judge does not make a determination of probable cause by examining the affidavit's paragraphs individually." *United States v. Anderson*, 933 F.2d 612, 614 (8th Cir. 1991). The issuing judge's task is "'to make a practical, common-sense decision whether, given *all* the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Gates*, 462 U.S. 238) (emphasis in original). As such, the affidavit "cannot be attacked paragraph by paragraph; it must be evaluated as a whole." *Id.* In the present case, the totality of the circumstances set forth in the affidavit support probable cause for the warrant's issuance.

With respect to Faulkner's challenge concerning the CRI's credibility and reliability, the affidavit attested to the CRI's reliability and the accuracy of his past tips. Moreover, the CRI's tip in the affidavit for the Hamline Address was partially corroborated when the investigation confirmed that Faulkner (1) possessed the kind of vehicle the CRI identified, (2) lived at the Hamline Address, and (3) drove to Chicago within the time frame specified by the CRI and stayed there for only a few hours before returning to Minnesota. The CRI also stated that he had direct and personal knowledge of Faulkner's drug-trafficking enterprise and that Faulkner would be returning to the Hamline Address after retrieving narcotics from Chicago. Even though, as Faulkner points out, none of the facts that law enforcement corroborated were illegal on their own,

"[w]hen an informant's information is at least partly corroborated, as it was in the instant case, 'attacks upon credibility and reliability are not crucial to the finding of probable cause.'" *United States v. Gladney*, 48 F.3d 309, 313 (8th Cir. 1995). Indeed, "[e]ven 'the corroboration of minor, innocent details'" can be enough to support a finding of probable cause. *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (quoting *United States v. Ramos*, 818 F.3d 1392, 1397 n.7 (8th Cir. 1987)). Here, law enforcement corroborated portions of the CRI's tip, including Faulkner's date of birth, what cars Faulkner drove, his association with the Hamline Address, and Faulkner's trips to Chicago. This corroboration lent credibility to the remainder of the CRI's tip.

Faulkner also argues that the CRI's information was stale. This argument is similarly unavailing. Probable cause must exist "at the time of the search and not merely at some earlier time." *United States v. Jeanetta*, 533 F.3d 651, 654 (8th Cir. 2008) (citation omitted). "There is no bright-line test for determining when information on a warrant has become stale." *United States v. Lemon*, 590 F.3d 62, 614 (8th Cir. 2010) (quoting *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008)). A "lapse of time" between a confidential informant's tip and law enforcement's action in reliance of that tip "is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999). An ongoing enterprise of drug trafficking of the kind described by the CRI in this matter is just such a continuing offense. *See Formaro*, 152 F.3d at 771. Accordingly, the information in the CRI's tip was not rendered stale by the three-week delay between the CRI's tip and the application for the Hamline Address search warrant.

As to Faulkner's argument that the affidavit contained no nexus between the alleged illegal activity and the address to be searched, the face of the warrant says otherwise. The CRI's tip, based on direct personal knowledge, provided that Faulkner drove to Chicago to retrieve heroin for distribution and sale in Minnesota, and that the first place Faulkner's car returned after a recent trip to Chicago was the Hamline Address. Importantly, "[t]his information was based on the informant's first-hand observations, not merely from rumor or innuendo." *Williams*, 10 F.3d at 594. Additionally, search warrants address probabilities, and therefore, "an affidavit need only establish the *probability* of criminal activity" rather than proof beyond a reasonable doubt. *United States v. Brown*, 584 F.2d 252, 257 (8th Cir. 1978) (emphasis added). Accordingly, Faulkner's argument that no nexus exists between the Hamline Address and the alleged illegal activity is unavailing.

In light of the foregoing, the Court concludes that the issuing judge had a sufficient basis for determining that probable cause existed to search the Hamline Address.

### 4.  James Address Affidavit and Warrant

The affidavit supporting the search warrant for the James Address contained the following information: law enforcement received a tip from a CRI that a black male was trafficking heroin from Chicago to North Minneapolis; the CRI had worked with law enforcement before and his tips had proved true and correct on numerous occasions; the CRI had direct personal knowledge of the male and his illegal narcotics trafficking; the CRI identified Faulkner by name and provided a picture of him; the CRI stated that

Faulkner makes trips to Chicago every one to three weeks to pick up at least 100 grams of heroin; the CRI stated that one of the vehicles Faulkner would drive was his orange Chevrolet Avalanche; Faulkner's criminal history revealed that Faulkner was a convicted felon with a narcotics- and weapons-related criminal past; DVS records revealed that Faulkner owns an orange Chevrolet Avalanche; the CRI stated that Faulkner used the James Address as a distribution point for his narcotics trade; Faulkner had provided the James Address as his own address to the DVS; the CRI provided a photograph of marijuana being grown at the James Address; law enforcement had attached a GPS tracking device to Faulkner's Avalanche and personally viewed Faulkner driving the orange Avalanche; data from the GPS tracking device showed that the Avalanche traveled to Chicago on October 16, stayed in the city for approximately 4 hours, and eventually returned to the James Address shortly after returning to Minnesota; data from the GPS tracking device showed the Avalanche in Chicago at the time of the warrant application; data from the GPS tracking device was consistent with night-time narcotics trafficking; and law enforcement believed that Faulkner would be returning to Minnesota with illegal narcotics. (Gov't Ex. 3.)

Faulkner's challenge to the affidavit and warrant to search the James Address parallels his challenge to the Hamline Address affidavit and search warrant. As such, to the extent that Faulkner challenges the affidavit and warrant to search the James Address due to the CRI's credibility and reliability, law enforcement's failure to corroborate any of the illegal details contained in the CRI's tip, and the purported staleness of the CRI's information, those challenges fail for the reasons stated above.

### 5. Avalanche Search Warrant

Faulkner raises no specific challenges to the affidavit and warrant to search his Avalanche. (*See* Def.'s Mem. in Supp.) Accordingly, the Court will undergo a four-corners review of the warrant and supporting affidavit to make a practical, common sense determination whether the Avalanche would contain contraband or evidence of a crime at the time the warrant was issued. *Anderson*, 933 F.2d at 614; *Jeanetta*, 533 F.3d at 654.

The affidavit supporting the warrant application for the Avalanche set forth the following facts: law enforcement received a tip from a CRI that a black male was trafficking heroin from Chicago to North Minneapolis; the CRI had worked with law enforcement before and his tips had proved true and correct on numerous occasions; the CRI had direct personal knowledge of the male and his illegal narcotics trafficking; the CRI identified Faulkner by name and provided a picture of him; the CRI stated that Faulkner makes trips to Chicago every one to three weeks to pick up at least 100 grams of heroin; the CRI stated that one of the vehicles Faulkner would drive was his orange Chevrolet Avalanche; Faulkner's criminal history revealed that Faulkner was a convicted felon with a narcotics- and weapons-related criminal past; DVS records revealed that Faulkner owns an orange Chevrolet Avalanche; Faulkner provided the Hamline Address as his own address on his vehicle registration for the Avalanche and also stayed at the James Address; law enforcement had attached a GPS tracking device to Faulkner's Avalanche and personally viewed Faulkner driving the orange Avalanche; data from the GPS tracking device showed that the Avalanche traveled to Chicago on October 16, stayed in the city for approximately 4 hours, and drove back to the Hamline Address; data

from the GPS tracking device shows the Avalanche in Chicago at the time of the warrant application; data from the GPS tracker was consistent with night-time narcotics trafficking; and law enforcement believed that Faulkner would be returning to Minnesota with illegal narcotics. (Gov't Ex. 2.)

To the extent that Faulkner challenges the search of the Avalanche due to the CRI's credibility and reliability, law enforcement's failure to corroborate any of the illegal details contained in the CRI's tip, and the purported staleness of the CRI's information, those challenges are unsuccessful for the reasons set forth above. Based on the totality of the circumstances, the Court determines that the facts set forth in the supporting affidavit established a sufficient basis for the issuing judge to have concluded that it would be reasonable to seek evidence of narcotics trafficking in the Avalanche.

### 6. Buccal Swab Warrant

Faulkner challenges on its face the warrant to seize a known DNA sample via buccal swab. In his sworn affidavit in support of the buccal swab warrant application, Officer Humphrey attested to the following facts: in the course of an investigation, law enforcement executed a search warrant at the Hamline Address; Faulkner registered his vehicle to this address, and his name is listed as the occupant of the Hamline Address; Faulkner is a convicted felon and therefore prohibited from owning or possessing firearms; during the search of the Hamline Address, law enforcement found two handguns and a quantity of heroin. (Gov't Ex. 5.) Law enforcement also observed that the residence was a one bedroom apartment, no one else was present, and the door was locked when they arrived. Police therefore requested a warrant to obtain a known DNA

sample from Faulkner to compare with samples to be obtained from the recovered firearms.

Viewing the totality of the circumstances and the facts set forth in the affidavit, the Court determines that a sufficient basis existed for the issuing judge to determine that there was a fair probability that the buccal swab would produce evidence of a crime. Moreover, because this Court determined above that the GPS tracking device placement and the search of the Hamline Address were supported by probable cause, evidence seized pursuant to the buccal swab warrant is not fruit of a poisonous tree. Accordingly, Faulkner's challenge to the buccal swab warrant fails.

### 7.  Second Hamline Address Warrant

With respect to the second search warrant for the Hamline Address, Faulkner first argues that probable cause was lacking because the warrant "is based on information obtained during previous, illegal searches and seizures." (Def.'s Mem. in Supp. at 46.) As set forth above, however, the previous searches and seizures in this matter were not illegal.

Faulkner further argues that law enforcement exceeded the scope of the warrant. This argument also fails. The affidavit sets forth the following: Faulkner is the subject of an ongoing investigation and was at that time under arrest for weapons and narcotics violations; when weapons investigators executed the first warrant for the Hamline Address, they located heroin and two handguns; when Faulkner was arrested, officers recovered vehicle keys, door keys, and a garage opener; and Faulkner is known to live at the Hamline Address. (Gov't Ex. 6.) Faulkner argues that the warrant authorized law

enforcement to enter only the "apartment for the bedding" and "his garage for contraband and to verify that the keys work." (Def.'s Mem. in Supp. at 54.)

The face of the second Hamline Address warrant belies Faulkner's argument. The warrant itself plainly authorizes law enforcement to search the Hamline Address and its associated detached garage for narcotics, narcotics paraphernalia, proceeds and currency, firearms and ammunition or related items, and other miscellaneous items (such as flash drives, address books, or ID cards), including but not limited to clothing bedding or other personal items that may contain DNA. (Gov't Ex. 6 at 4.) This authorization extends much further than Faulkner's argument presumes. The warrant allows entry into Faulkner's apartment and the apartment's detached garage in pursuit of evidence of all shapes and sizes, and officers could therefore search any room, container, crack or crevice that might contain evidence of the kinds particularized in the warrant. *E.g.*, *United States v. Weinbender*, 109 F.3d 1327, 1329 (8th Cir. 1997). As such, the Court finds Faulkner's challenge to the second search of the Hamline Address unpersuasive.

Viewing the totality of the circumstances and the facts set forth in the affidavit, the Court determines that a sufficient basis existed for the issuing judge to determine that there was a fair probability that the second search of the Hamline Address would produce evidence of a crime.

### 8.   Irving Address Warrant

With respect to the search warrant for the Irving Address, Faulkner argues[6] that probable cause was lacking because the warrant "was based on execution of an arrest warrant that was, in turn, based solely on evidence obtained from illegal searches and seizures." (Def.'s Mem. in Supp. at 47.) As set forth above, however, the previous searches and seizures in this matter were not illegal. Because the information supporting the warrant for the Irving Address was not fruit of a poisonous tree, Faulkner's challenged to the warrant must fail.

### B. *Miranda* Does Not Require Suppression of Faulkner's Statements at the Irving Address

Finally, Faulkner argues that the statements he made after he was arrested at the Irving Address were obtained in violation of his *Miranda* rights. Under *Miranda*, law enforcement officials must inform suspects in custody of their Fifth Amendment rights before any interrogation can take place. 384 U.S. 436 (1966). Neither party disputes that Faulkner was in custody after he was placed under arrest at the Irving Address. Thus, the issue is whether Faulkner's statements to Officer Domek concerning his clothes were in response to interrogation.

"A question is interrogation if it is 'reasonably likely to elicit' incriminating information." *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600-01 (1990)). Requests for routine information

---

[6] Faulkner's argument that the testimony offered at the motions hearing satisfies his burden to show the need for a *Franks* hearing is addressed in the contemporaneously filed Order on Pretrial Motions in this case.

necessary for identification purposes do not qualify as interrogation unless "the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged." *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) (quoting *United States v. McLaughlin*, 777 F.2d 388, 391-92 (8th Cir. 1985) (internal quotation marks omitted) and citing *Muniz*, 296 U.S. at 602 n.14)). "Voluntary statements not in response to an interrogation," however, "are admissible with or without *Miranda* warnings." *United States v. McGlothen*, 556 F.3d 698, 701 (8th Cir. 2009).

A similar scenario arose in *Grymes v. State*, 30 A.3d 1032 (Md. Ct. App. 2011). There, the defendant also requested clothing after he was arrested but before he had been read his *Miranda* rights. *Id.*, 30 A.3d at 1047-48. The defendant later challenged admission of a cell phone found in a pocket of one of the jackets he identified as his. *Id.* at 1048. In that case, as in this one, there was "no dispute that the [defendant] was in custody" when he requested his clothing. *Id.* The *Grymes* court found "no merit" in the argument that, under the circumstances, the officer's "act of showing the clothing to [the defendant] for his identification" constituted interrogation under *Miranda*. *Id.* The officer, according to the court, "acted reasonably and lawfully" by responding to the defendants' request for clothing on a cold day and in confirming that the clothing he had retrieved actually belonged to the defendant. *Id.* Throughout this interaction, the defendant was not "subjected to compelling influences, psychological ploys, or direct questioning." *Id.* The Court found that no interrogation had occurred, and the defendant's motion to suppress was properly denied. *Id.*

The facts of Faulkner's case dictate the same result. On a cold mid-winter morning in Minneapolis, Faulkner requested clothing after he was arrested but before he was transported to jail. Once inside the room that Faulkner identified as his, Faulkner directed Officer Domek to the certain pieces of clothing that he wanted and a black down jacket. Officer Domek searched each piece of clothing for contraband or weapons before handing them to Faulkner, which is a reasonable search incident to Faulkner's arrest. *See Chimel v. California*, 395 U.S. 752, 762-63 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape."). After Faulkner dressed, another officer informed Officer Domek that they had found heroin in the pocket of the coat that Faulkner had identified as his before Faulkner put it on.

"The requirements of *Miranda*, including warnings before custodial interrogation, 'were designed to vest a suspect in custody with an added measure of protection against coercive police practices.'" *United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Here, Faulkner initiated the exchange by requesting clothes, and Officer Domek searched only those clothes that Faulkner identified as his. There is nothing in the record to suggest that law enforcement decided to arrest Faulkner in mid-January as a ploy in hopes that he would request clothing that would contain evidence to use against him. Nor did Officer Domek direct Faulkner to identify only clothes that might contain incriminating evidence. In short, Officer Domek could not reasonably have foreseen that the process of verifying

what clothes Faulkner wanted to put on before going to jail was reasonably likely to elicit incriminating information. *See Innis*, 446 U.S. at 301 ("[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (emphasis in original)). Accordingly, Faulkner's motion to suppress statements made at the Irving Address after he was arrested but before he was Mirandized must fail.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Faulkner's Motion to Dismiss (ECF No. 43) Motions to Suppress Evidence Obtained as a Result of Search and Seizure (ECF Nos. 23, 42) and, to the extent it requests suppression of evidence, Faulkner's Supplemental Motion to Suppress and Request for Franks Hearing (ECF No. 39) be **DENIED.**


Date:  June 20, 2014                             s/ Tony N. Leung
                                                 Tony N. Leung
                                                 United States Magistrate Judge
                                                 District of Minnesota

                                                 *United States of America v. Faulkner*
                                                 File No. 14-cr-05 (JNE/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. This Report and Recommendation does not constitute an order from

the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **July 7, 2014**.